IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

LINDA S. GAGE                                                PLAINTIFF

v.                     NO. 3:16-cv-00344 PSH

NANCY A. BERRYHILL, Acting Commissioner              DEFENDANT
of the Social Security Administration

### MEMORANDUM OPINION AND ORDER

Plaintiff Linda S. Gage ("Gage") began the case at bar by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, she challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon findings made by an Administrative Law Judge ("ALJ").

Gage maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole and offers two reasons why.[1] Gage first maintains that her impairments meet or equal Listing 1.02, and the ALJ erred at step three of the sequential evaluation process when she failed to so find.[2]

---

[1]     The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

[2]     Gage maintains that her impairments meet or equal Listings 1.00B2b and 1.00B2c. 1.00B2b and 1.00B2c, though, are not listings in the conventional sense. 1.00B2b defines, and provides examples of, what is meant by the phrase "inability to ambulate effectively." 1.00B2c defines, and provides examples of, what is meant by the phrase "inability to perform fine and gross movements effectively." Like the Commissioner, the Court believes Gage intends to allege that her impairments meet or equal Listing 1.02. The Court will therefore analyze her first assertion of error pursuant to Listing 1.02.

At step three, the ALJ is required to determine whether a claimant's impairments meet or equal a listed impairment. See Raney v. Barnhart, 396 F.3d 1007 (8th Cir. 2005). The determination is solely a medical determination, see Cockerham v. Sullivan, 895 F.2d 492 (8th Cir. 1990), and the claimant bears the burden of showing that her impairments meet or equal a listed impairment, see Pyland v. Apfel, 149 F.3d 873 (8th Cir. 1998).

Listing 1.02 encompasses a major dysfunction of a joint and is characterized by "gross anatomical deformity … and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s) and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)." See Listing 1.02. The listing additionally requires the involvement of one major peripheral weight-bearing joint resulting in an inability to ambulate effectively as defined in 1.00B2b or the involvement of one peripheral joint in each upper extremity resulting in an inability to perform fine and gross movements effectively as defined in 1.00B2c.

The inability to ambulate effectively means "an extreme limitation of the ability to walk." See Listing 1.00B2b. It includes, but is not limited to, such things as the inability to walk without the use of a walker or the inability to walk without the use of two crutches or two canes.

The inability to perform fine and gross movements effectively means "an extreme loss of function of both upper extremities." See Listing 1.00B2c. It includes, but is not limited to, such things as the inability to prepare a simple meal and feed oneself and the inability to take care of personal hygiene.

Gage alleges that she became disabled on December 1, 2013, as a result of impairments that include back problems, diabetes, left arm pain, and feet problems. In her brief, she represents that her ambulatory limitation is caused by "chronic back and heel pain." See Docket Entry 11 at CM/ECF 13. She also represents in her brief that her upper extremity limitation is caused by "an impingement of her left shoulder" and the pain the impingement causes in her neck, back, and shoulder. See Docket Entry 11 at CM/ECF 7, 13.

The medical evidence relevant to Gage's ambulatory and upper extremity impairments reflects that she has sought medical attention for her back pain at irregular intervals. She underwent testing in January of 2010, and the results revealed, in part, the following: "[t]he bony structures in the T-spine show a little bit of mild osteoarthritic type changes." See Transcript at 321. In March of 2013, she presented to a medical clinic complaining of back pain. See Transcript at 275-278. She represented that the pain radiated along her right side. Her vital signs were taken and reflected, inter alia, that she was sixty-four inches tall and weighed 174 pounds, or had a Body Mass Index ("BMI") of 29.71. No joint swelling or tenderness was noted, and no spinal tenderness was noted. A backache was assessed. In June of 2014, Gage was seen again for back pain. See Transcript at 494/507-509. She denied numbness and tingling but reported that the pain was exacerbated by standing and bending. She reported pain upon lumbar flexion, extension, and rotation, and her lumbar spine was tender to palpation. Physical therapy was recommended, as was a home exercise program that included stretching. She never completed the therapy program, though, because she was discharged from it because of her non-attendance.

Gage has occasionally sought medical attention for leg pain and restless leg syndrome. The record indicates that she did so on at least three occasions prior to June of 2014. See Transcript at 334, 332-333, 315-316. No significant findings were recorded. In June of 2014, she presented to a medical clinic complaining of leg pain. See Transcript at 510-513. Her vital signs were taken and reflected, inter alia, that she was sixty-four inches tall and weighed 177 pounds, or had BMI of 30.38. A musculoskeletal examination was abnormal. The assessment included a backache and diabetes mellitus. Medication was prescribed. Gage was seen for depression in August of 2014. See Transcript at 452-453. The report from that examination is noteworthy because the nurse practitioner noted that Gage had pain in her calves when walking any distance.

Gage has on occasion sought medical attention for heel pain. In October of 2007, she presented to a medical clinic complaining of a burning sensation in her feet. See Transcript at 323-324. It was attributed to diabetic neuropathy, and she was prescribed medication. She did not seek medical attention for her heel pain again until February of 2013. See Transcript at 282-284. No significant findings were recorded, but diabetes mellitus was again diagnosed.

Gage has on occasion sought medical attention for pain and swelling in her right shoulder. In September of 2006, she presented to a medical clinic complaining of right shoulder pain. See Transcript at 339. A strain/spasm in her rhomboid muscles was assessed, and medication was prescribed. She did not seek medical attention for her right shoulder again until September of 2014. See Transcript at 498-499. At that time, she exhibited a decreased range of motion in her shoulder and some tenderness but had no effusion or swelling. Joint pain was diagnosed.

Gage has also sought medical attention for pain in her left shoulder, and a left shoulder impingement has been noted. See Transcript at 253. In October of 2012, she presented to a medical clinic complaining of pain in her left shoulder. See Transcript at 291-294. She reported that a recent "steroid shot" had helped, as did over-the-counter ibuprofen. See Transcript at 291. A musculoskeletal examination revealed joint pain and stiffness but no joint swelling. Joint pain and diabetes mellitus were assessed. Gage declined an x-ray and attributed the pain to "just arthritis and working." See Transcript at 294. Mobic was prescribed.

In February of 2013 and again in March of 2013, Gage presented to a medical clinic complaining of left shoulder pain. See Transcript at 282-284, 390-392. No joint swelling or tenderness was noted in February of 2013, but joint pain localized in her left shoulder was assessed. In March of 2013, the attending physician recorded Gage's report that "[h]er pain radiates down to the elbow at times" and her pain "increased with overhead activity, behind the back activities, and when she sleeps on her left side." See Transcript at 391. Gage was observed to have a decreased range of motion in her left shoulder. A treatment plan included therapy and a home exercise program that included stretching and strengthening exercises.

In February and March of 2014, Dr. James Ameika, M.D., ("Ameika") saw Gage in connection with medical imaging testing and to discuss the occulsion, or blockage, he found in her right and left internal carotid arteries. See Transcript at 356-359, 363-367. The findings contained in his reports are relevant to her ambulatory and upper extremity impairments in the following four respects. First, he observed that she had "no weakness involving either of her upper or lower extremities." See Transcript at

5

356. Second, a musculoskeletal examination revealed no evidence of arthralgia, joint pain, joint swelling, limb pain, or limb swelling. Third, an examination of her extremities revealed the following: "pedal pulses are within normal limits, … no clubbing, edema was not present, showed no cyanosis, cellulitis was not present, …" See Transcript at 359. Fourth, a neurological examination revealed, inter alia, that she had no difficulty walking but had a normal gait.

At step three, the ALJ considered whether Gage's impairments meet or equal several of the listings. The ALJ specifically considered whether Gage's impairments meet or equal Listing 1.02. The ALJ found that they do not meet the listing because "the available medical evidence did not demonstrate the specified criteria required of the listing." See Transcript at 15. In so finding, the ALJ observed that "the evidence does not demonstrate that the claimant has the degree of difficulty in performing fine and gross movements as defined in 1.00B2c." See Transcript at 15. The ALJ made no observation with regard to whether Gage's impairments give rise to an inability to ambulate effectively as required by 1.00B2b. In considering whether Gage's impairments meet or equal Listing 1.04, though, the ALJ observed that "there is no evidence … [his] back disorder result[s] in an inability to ambulate effectively …" See Transcript at 15.[3]

Substantial evidence on the record as a whole supports the ALJ's finding at step three because Gage has failed to produce medical evidence that her impairments meet or equal Listing 1.02. The Court so finds for two reasons.

---

[3] Listing 1.04 encompasses disorders of the spine and requires evidence of "nerve root compression, spinal arachnoiditis or lumbar spinal stenosis." See Transcript at 15. The ALJ found that Gage's impairments did not meet or equal Listing 1.04.

6

First, there is no medical evidence that Gage's impairments result in an inability to ambulate effectively, i.e., she has "an extreme limitation of the ability to walk." It is true that she has a history of back, leg, and heel problems, and testing has revealed "mild osteoarthritic type changes" in her thoracic spine. See Transcript at 321. Her back problems, though, were characterized as a backache, and there is no medical evidence her problems impair her ability to walk or otherwise require the use of an assistive device. Ameika observed that Gage had no weakness in either of her lower extremities and observed that she had no difficulty walking but had a normal gait. On more than one occasion, home exercises were recommended. Gage testified during the administrative hearing that she falls at least three times a week, see Transcript at 43, but she has offered no medical evidence to substantiate her testimony.

Second, there is no medical evidence that Gage's impairments result in an inability to perform fine and gross movements effectively. Admittedly, she has a history of shoulder pain and has a history of a left shoulder impingement. She also has, at times, exhibited a reduced range of motion in her left shoulder. Nevertheless, her shoulder impairment does not give rise to "an extreme loss of function of both upper extremities." Ameika observed that Gage had no weakness in either of her upper extremities, and he could find no evidence of joint swelling or limb swelling. On more than one occasion, home exercises were recommended, part of which involved stretching and strengthening exercises. Gage also represented in a series of disability documents that she can attend to her personal care, see Transcript at 220, and she testified during the administrative hearing that she is able to clean her house, do laundry, and cook, see Transcript at 39.

7

Gage offers a second reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. Gage maintains that her residual functional capacity was not properly assessed because she is unable to perform light work as the ALJ found.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). As a part of making the assessment, the ALJ is required to evaluate the claimant's subjective complaints. See Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001). The ALJ does so by considering the medical evidence and evidence of the claimant's daily activities; the duration, frequency, and intensity of her pain; the dosage and effectiveness of medication; any precipitating and aggravating factors; and any functional restrictions.

The medical evidence relevant to Gage's impairments reflects that she has a history of depressive symptoms and has taken medication for them.[4] In June of 2014, she was seen by Dr. Catherine Hubbard Adams, Ph.D., ("Adams") for a mental diagnostic evaluation. See Transcript at 427-432. Gage reported that she wanted to sleep all the time and was having nightmares every other night. Gage was dressed appropriately, her predominant mood was nervous, and her affect was appropriate. Adams diagnosed a generalized anxiety disorder and made the following findings with respect to Gage's adaptive functioning:

---

[4]     The Court will not repeat the summary of Gage's shoulder, back, leg, and heel problems.

8

>How do mental impairments interfere with this person's day to day adaptive functioning? ... Claimant's difficulties do not seem to interfere with age-appropriate ADLs [i.e., activities of daily living]. Some of her ADLs, such as driving, are limited, but this seems due to physical ailments and not cognitive or mental challenges.
>
>Capacity to communicate and interact in a socially adequate manner? ... Claimant's interactions during interview were appropriate.
>
>Capacity to communicate in an intelligible and effective manner? Claimant communicated in a manner that was effective and intelligible.
>
>Capacity to cope with the typical mental/cognitive demands of basic work-like tasks? Claimant seems to have difficulty coping with work-type demands. [She] seems to struggle with turning in assignments and maintaining focus to stay on tasks.
>
>Ability to attend and sustain concentration on basic tasks? The claimant seems to have difficulty attending and sustaining concentration on basic tasks. Her performance today indicates limited working memory. This limitation does not seem due to anxiety, but is potentially related to diabetes or previous seizure history.
>
>Capacity to sustain persistence in completing tasks? It seems claimant has little difficulty sustaining persistence in completing work tasks.
>
>Capacity to complete work-like tasks within an acceptable timeframe? Claimant seems to have little difficulty completing tasks within an acceptable timeframe.

See Transcript at 430-431. Adams opined that Gage was capable of managing her finances without assistance. Adams found no evidence of malingering.

Gage was seen for her depressive symptoms on at least two subsequent occasions. See Transcript at 493/504-506, 452-453. On each occasion, she was awake, alert, and oriented to person, place, and time. No remarkable findings were noted, but she was diagnosed with depression and anxiety. Medication was prescribed for her symptoms.

9

Gage has a history of small vessel ischemic disease. See Transcript at 356-359, 363-367. Testing revealed that she has one hundred percent "occulusions of both the right and left internal carotid arteries," but Ameika opined that there was "nothing surgical to be done …, see Transcript at 356. He noted no evidence of stroke or stroke-like symptoms. See Transcript at 366. He encouraged her to work "very hard on her risk factors including the need to stop smoking and maintain well controlled blood pressure and cholesterol levels." See Transcript at 356.

Gage has a history of obesity and diabetes mellitus. Her BMI has routinely been in the twenty-nine to thirty range, which places her in the obese range. She takes insulin for her diabetes mellitus and checks her blood sugar regularly.

Gage also has a history of right eye problems apparently associated with diabetes mellitus and has sought frequent treatment for her eye problems. See Transcript at 264-267 (10/29/2013), 257-259 (01/22/2014), 253-256/447 (01/28/2014), 444-446 (02/04/2014), 349-351 (02/18/2014), 347-348 (02/25/2014), 443 (03/05/2014), 345 (03/18/2014), 344 (04/18/2014), 442 (04/16/2014), 411 (07/14/2014). The problem caused, inter alia, blurred vision, pain, redness, and light sensitivity. She was prescribed medication, an ointment, and given an injection to treat her symptoms, but the treatment provided only temporary relief. She was eventually diagnosed with rubeosis of the right eye.[5]

---

[5] The record reflects that Gage also has a history of seizures, epilepsy and hearing problems. The Court will not devote much attention to those impairments, save to note the following. The medical evidence pertaining to her seizure disorder is minimal. Although she takes seizure medication, she testified during the administrative hearing that she has not had a seizure in three or four years. See Transcript at 43. The medical evidence pertaining to her epilepsy is equally minimal. It is included as a diagnosis on some of the progress notes, see Transcript at 478, but the impact of the impairment on her residual functional capacity is not clear. Gage has been diagnosed with otitis media, or an inflammation of the middle ear, see Transcript at 478, and has been prescribed medication. She subsequently reported that the medication provided little relief, and her hearing problems persisted.

Gage's medical records were reviewed by state agency medical professionals. <u>See</u> Transcript at 63-77, 80-96. They opined that Gage is capable of performing a reduced range of light work.

A summary of the non-medical evidence indicates that Gage worked between the years 1993 and 2012. A summary of her FICA earnings reflects that although her earnings during that period were modest, her work was mostly regular. <u>See</u> Transcript at 164.

Gage completed a series of documents in connection with her application for disability insurance benefits. <u>See</u> Transcript at 217-218, 219-226. In the documents, she represented that she experiences pain in her back and legs on a daily basis. She cannot stand or walk for long periods of time and begins to experience pain after only about ten minutes. She also has problems with her right eye. Her impairments affect her ability to lift, stand, walk, climb stairs, kneel, squat, reach, see, bend, remember, and complete tasks. She helps take care of her spouse and is capable of attending to her own personal care, preparing meals, cleaning, doing laundry, and driving an automobile, although she does not do so because of her poor vision. She shops and can pay her bills. She can follow written instructions "semi-well" and follow spoken instructions "well." <u>See</u> Transcript at 224.

Gage testified during the administrative hearing. See Transcript at 34-54. She was born on March 19, 1962, and was fifty-three years old at the time of the hearing. She completed the eleventh grade in school but did not graduate. She smokes a pack of cigarettes a day. She spends her day cleaning her house and doing laundry but must take frequent breaks. She is unable to perform any outdoor activities. Gage must spend

11

two hours a day resting. Her inability to stand and her anxiety prevent her from working. She takes five shot a day for her diabetes mellitus. She has had seizures in the past, but she has not had one in three or four years. She can be around people but does not enjoy it. She falls at least three times a week but does not know why she falls. She has trouble seeing out of her right eye, and eyeglasses do not help her vision.

The ALJ found at step two that Gage has severe impairments in the form of "diabetes mellitus, small vessel ischemic disease, history of epilepsy, right shoulder joint pain, lower back pain, 100 percent occlusion of both the right and left carotid arteries, right eye vision loss, bilateral hearing loss with otitis media, obesity, depression, and generalized anxiety disorder." See Transcript at 14. The ALJ assessed Gage's residual functional capacity and found that she can perform light work with the following limitations: "the claimant must avoid moderate exposure to hazards, is limited to work where monocular vision is permitted, can occasionally reach overhead, and is limited to simple and routine work with simple instructions." See Transcript at 17. The ALJ found at step four that Gage cannot return to her past relevant work but found at step five that there is other work she can perform. The ALJ therefore concluded that Gage was not disabled for purposes of the Social Security Act.

Gage has limitations caused by various impairments. The question for the ALJ was the extent to which they impact the most Gage can do. The ALJ incorporated limitations for the impairments into the assessment of Gage's residual functional capacity but found she was not disabled. The ALJ could find as he did as substantial evidence on the record as a whole supports his consideration of the evidence and his assessment of her residual functional capacity. The Court so finds for several reasons.

First, the ALJ adequately considered the medical evidence relevant to Gage's mental impairments. The ALJ could and did credit Adams' opinions that Gage can perform most activities of daily living; can communicate and interact in a socially adequate, effective, and intelligible manner; has little difficulty sustaining persistence in completing work tasks; and seems to have little difficulty completing tasks within an acceptable timeframe. Adams also opined, though, that Gage "seems to have difficulty coping with work-type demands," "seems to struggle with turning in assignments and maintaining focus to stay on tasks," and "seems to have difficulty attending and sustaining concentration on basic tasks." See Transcript at 430. The ALJ could and did also credit the state agency medical professionals who opined that Gage is limited to unskilled work. The ALJ accounted for the abovementioned limitations in crafting Gage's residual functional capacity because he limited her to "simple and routine work with simple instructions." See Transcript at 17.

Second, the ALJ adequately considered the non-medical evidence relevant to Gage's mental impairments. Gage represented in her disability documents that she can follow written instructions "semi-well" and follow spoken instructions "well." See Transcript at 224. It is true that Gage prefers to be alone, but, as the ALJ could and did note, "[Gage] testified she visits with friends and family on a weekly basis." See Transcript at 21. The ALJ noted during the administrative hearing that Gage had worked around people for approximately fifteen years but was now maintaining she could not be around people. When asked what brought about the change, Gage testified as follows: "I'm not saying I'm not able to be around people. I, I just—it—it's not the same as it was like five years ago." See Transcript at 41.

Third, the ALJ adequately considered the medical evidence relevant to Gage's physical impairments. The ALJ could and did find that Gage has limitations caused by eye problems and shoulder pain and incorporated those limitations into the assessment of her residual functional capacity. Specifically, the ALJ found, inter alia, that Gage is limited to work where monocular vision is permitted and can only occasionally reach overhead.[6] Although Gage's diabetes mellitus and obesity give rise to work-related limitations, they do not give rise to such severe limitations that she is prevented from performing light work. She was repeatedly found to have no joint swelling, no tenderness, no spinal tenderness, a normal gait, normal neurological and motor examinations, and normal strength. At times, she exhibited a reduced range of motion. When Ameika saw Gage in February of 2014 and again in March of 2014, though, he observed that she had no weakness in either of her upper or lower extremities and had no difficulty walking.

Fourth, the ALJ adequately considered the non-medical evidence relevant to Gage's physical impairments. Specifically, the ALJ considered and credited that Gage is capable of performing most of her daily activities, activities that include attending to her own personal care, preparing meals, and cooking. The ALJ repeatedly noted Gage's use of medication and the fact that it provided only temporary relief for her symptoms. The ALJ could and did also note that Gage has ignored the repeated advice of her medical professionals to stop smoking. The ALJ noted that smoking "negatively affect[s] [Gage's] carotid arteries" and her "eye condition." See Transcript at 21.

---

[6] It appears that the ALJ also accounted for Gage's history of seizures when he found that she must avoid moderate exposure to hazards.

Gage appears to challenge the finding that she can perform light work, noting that light work requires the ability to stand and walk for up to six hours in an eight hour workday. The ALJ could, though, find as she did. The findings with respect to Gage's ability to stand and walk are unremarkable as she was repeatedly observed to have no joint swelling, no tenderness, no spinal tenderness, a normal gait, normal neurological and motor examinations, and normal strength.[7]

The governing standard in this case, i.e., substantial evidence on the record as a whole, allows for the possibility of drawing two inconsistent conclusions. See Culbertson v. Shalala, 30 F.3d 934 (8th Cir. 1994). In this instance, the ALJ's assessment of Gage's residual functional capacity was not improper, and the ALJ could find as she did.

On the basis of the foregoing, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings. Gage's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 27th day of June, 2017.

_____
UNITED STATES MAGISTRATE JUDGE

---

[7] Gage also appears to challenge a hypothetical question posed to the vocational expert. See Docket Entry 11 at CM/ECF 14-15. There is no merit to Gage's assertion.